**No. 25-12988**

---

*In the*

# United States Court of Appeals
*for the*
## Eleventh Circuit

---

JOHN ESPOSITO,
*Plaintiff-Appellant*,

– v. –

ATTORNEY GENERAL, STATE OF GEORGIA et al.,
*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Georgia
Case No. 1:24-cv-05486, Hon. Mark H. Cohen

---

### OPENING BRIEF FOR PLAINTIFF-APPELLANT

---

ANNA ARCENEAUX
  *Georgia Resource Center*
  *104 Marietta Street NW*
  *Suite 260*
  *Atlanta, GA 30303*
  *(404) 222-9202*

MARCIA A. WIDDER
  *312 St. Paul Ave.*
  *Atlanta, GA 30312*
  *(504) 231-5651*

PAUL W. HUGHES
CAITLIN SHEARD
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

MARK PEARLSTEIN
  *McDermott Will & Schulte LLP*
  *200 Clarendon Street, Floor 58*
  *Boston, MA 02116*
  *(617) 535-4000*

*Counsel for Plaintiff-Appellant John Esposito*

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, the following list contains all trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, and parent corporations, any publicly held company that owns 10% or more of a party's stock, and other identifiable legal entities related to a party:

Anna Arceneaux – counsel for Appellant

T. Wright Barksdale, III, District Attorney of the Ocmulgee Judicial Circuit – Appellee

Christopher Carr, Attorney General, State of Georgia – Appellee

Department of Law, Office of the Attorney General for the State of Georgia – counsel for Appellees

Honorable Mark H. Cohen, United States District Judge for the Northern District of Georgia

John Esposito – Appellant

Georgia Resource Center – counsel for Appellant

Sabrina Graham – counsel for Appellees

Paul W. Hughes – counsel for Appellant

Robert S. Markley, Monroe County Sheriff – Appellee

ii

McDermott Will & Schulte LLP – counsel for Appellant

Wanda Paul, Baldwin County Clerk of Court - Appellee

Mark Pearlstein – counsel for Appellant

Caitlin Sheard – counsel for Appellant

Marcia A. Widder – counsel for Appellant

Emmett Witkovsky-Eldred – counsel for Appellant

I certify the above information is accurate and complete to the best of

my knowledge.

Dated: November 7, 2025             /s/ *Paul W. Hughes*
                                    Paul W. Hughes

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant John Esposito respectfully requests oral argument. This appeal raises important constitutional issues of first impression that will bear on the ability of a death-sentenced person in Georgia to seek and obtain DNA testing that would support the grant of a new trial or sentencing proceeding. These issues are complex and novel. Oral argument will help the Court understand the complexities and nuances of the case.

**TABLE OF CONTENTS**

Certificate of Interested Persons ................................................................ ii

Statement Regarding Oral Argument ......................................................... iv

Table of Authorities ................................................................................... vi

Introduction ................................................................................................. 1

Jurisdiction .................................................................................................. 3

Issue Statement .......................................................................................... 3

Statement of the Case ................................................................................. 4

    A. Legal background ............................................................................. 4

    B. Factual background .......................................................................... 5

    C. Procedural background ..................................................................... 7

        1. Post-conviction proceedings ...................................................... 7

        2. Mr. Esposito's motion for DNA testing ................................... 8

        3. Mr. Esposito's federal court complaint .................................. 11

Summary of Argument .............................................................................. 15

Argument ................................................................................................... 18

I. The complaint plausibly alleges that the purpose-of-delay
provision violates the Equal Protection Clause. ................................. 19

    A. The purpose-of-delay provision imposes a uniquely heavy
burden on death-sentenced individuals. ....................................... 20

    B. The purpose-of-delay provision imposes this dispositive
barrier *only* on death-sentenced individuals. ............................. 26

    C. This disparate treatment is not related to a legitimate
government purpose. ...................................................................... 29

II. The complaint plausibly alleges that two provisions of the DNA
statute violate procedural due process ............................................... 39

    A. The purpose-of-delay provision renders illusory death-
sentenced individuals' right under Georgia law to obtain
DNA testing. .................................................................................. 39

    B. The reasonable-probability standard imposes an impossibly
high standard for DNA testing in capital cases. ......................... 48

III. The complaint plausibly alleges that the DNA statute violates
the Eighth Amendment. ...................................................................... 55

Conclusion ................................................................................................. 60

## TABLE OF AUTHORITIES†

**Cases**

*Alabama Legislative Black Caucus v. Alabama,*
  575 U.S. 254 (2015) ........................................................................ 58

*Alvarez v. Att'y Gen. for Fla.,*
  679 F.3d 1257 (11th Cir. 2012) ................................................ 42, 56

*Arthur v. Thomas,*
  674 F.3d 1257 (11th Cir. 2012) ................................................ 35, 47

*Beck v. Alabama,*
  447 U.S. 625 (1980) ........................................................................ 41

*Bharadia v. State,*
  774 S.E.2d 90 (Ga. 2015) ............................................................... 21

*Brady v. State,*
  174 A.2d 167 (Md. Ct. App. 1961) ............................................ 52, 59

*Brown v. Zavaras,*
  63 F.3d 967 (10th Cir. 1995) .......................................................... 35

*Brumfield v. Cain,*
  576 U.S. 305 (2015) .................................................................. 58, 59

*Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.,*
  147 F.4th 1341 (11th Cir. 2025) ...................................... 18, 19, 30

*Cavalieri v. Avior Airlines C.A.,*
  25 F.4th 843 (11th Cir. 2022) ........................................................ 18

*Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.,*
  48 F.4th 1222 (11th Cir. 2022) ...................................................... 19

*Chaparro v. Carnival Corp.,*
  693 F.3d 1333 (11th Cir. 2012) ..................................................... 19

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ........................................................................ 19

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985) .................................................................. 40, 47

---

† Authorities marked with an asterisk indicates cases primarily relied upon.

## Cases—continued

*Commonwealth v. Hardy*,
  337 A.3d 385 (Pa. 2025)............................................................... 44

*Crawford v. State*,
  597 S.E.2d 403 (Ga. 2004)............................................................. 5

*Cromartie v. Shealy*,
  941 F.3d 1244 (11th Cir. 2019) ...................... 14, 39-42, 45-47, 51, 54-55

*Cromartie v. Shealy*,
  No. 7:19-CV-00181 (M.D. Ga. Oct. 28, 2019)........................................... 45

*Cunningham v. Dist. Attorney's Off. for Escambia Cnty.*,
  592 F.3d 1237 (11th Cir. 2010) ............................................................ 42

*D.C. Ct. of Appeals v. Feldman*,
  460 U.S. 462 (1983) ............................................................. 21

*In re Davis*,
  557 U.S. 952 (2009) ............................................................. 59

*Day v. McDonough*,
  547 U.S. 198 (2006) ............................................................. 58

*Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*,
  557 U.S. 52 (2009) ...................... 1, 39-41, 43, 47, 51-52, 54, 59

*Duncan v. Ornoski*,
  528 F.3d 1222 (9th Cir. 2008) ............................................................. 52

*Esposito v. Hall*,
  No. S11E1608 (Ga. Mar. 19, 2012) ......................................................... 7

*Esposito v. State*,
  538 S.E.2d 55 (2000)............................................................. 7

*Esposito v. State*,
  881 S.E.2d 686 (Ga. 2022)......................................................... 11, 23, 50

*Esposito v. Warden*,
  818 F. App'x 962 (11th Cir. 2020)........................................................... 8

*Gardner v. Florida*,
  430 U.S. 349 (1977) ............................................................. 55

*Giarratano v. Johnson*,
  521 F.3d 298 (4th Cir. 2008) ............................................................. 35

**Cases—continued**

*Green v. Georgia,*
  442 U.S. 95 (1979) ............................................................... 49

*Gregg v. Georgia,*
  428 U.S. 153 (1976) .............................................................. 57

*Griffin v. Illinois,*
  351 U.S. 12 (1956) ............................................................... 28

*Hall v. State,*
  244 S.E.2d 833 (1978).......................................................... 54

*Hammond v. Com.,*
  366 S.W.3d 425 (Ky. 2012) ................................................... 30

*Harmelin v. Michigan,*
  501 U.S. 957 (1991) .............................................................. 41

*Herrera v. Collins,*
  506 U.S. 390 (1993) .............................................................. 59

*Hopkins v. Reeves,*
  524 U.S. 88 (1998) ............................................................... 41

*Humphrey v. Morrow,*
  717 S.E.2d 168 (Ga. 2011) ................................................... 49

*Johnson v. Mississippi,*
  486 U.S. 578 (1988) .............................................................. 55

*Johnson v. Smith,*
  696 F.2d 1334 (11th Cir. 1983) ...................................... 26, 27

*Lehr v. Robertson,*
  463 U.S. 248 (1983) .............................................................. 19

*Leib v. Hillsborough Cnty. Pub. Trans. Comm.,*
  558 F.3d 1301 (11th Cir. 2009) ............................................ 36

*Lockett v. Ohio,*
  438 U.S. 586 (1978) ........................................................ 38, 57

*M.L.B. v. S.L.J.,*
  519 U.S. 102 (1996) .............................................................. 28

*Newman Marchive P'ship, Inc. v. Hightower,*
  349 F. App'x 963 (5th Cir. 2009)........................................... 37

**Cases—continued**

*Newton v. City of New York*,
779 F.3d 140 (2d Cir. 2015)........................................................ 40

*Penry v. Lynaugh*,
492 U.S. 302 (1989) ..................................................................... 38

*Pers. Adm'r of Massachusetts v. Feeney*,
442 U.S. 256 (1979) ..................................................................... 28

*Price v. Comm'r, Dep't of Corr.*,
920 F.3d 1317 (11th Cir. 2019) ................................................. 37

*Raidoo v. Moylan*,
75 F.4th 1115 (9th Cir. 2023)..................................................... 32

*Reams v. State*,
560 S.W.3d 441 (Ark. 2018) ...................................................... 52

*Rooker v. Fid. Tr. Co.*,
263 U.S. 413 (1923) ..................................................................... 21

*Roper v. Simmons*,
543 U.S. 551 (2005) .............................................................. 55, 58

*Sanchez v. Off. of State Superintendent of Educ.*,
45 F.4th 388 (D.C. Cir. 2022)..................................................... 35

*Sears v. Warden GDCP*,
73 F.4th 1269 (11th Cir. 2023)................................................... 38

*Skinner v. Switzer*,
562 U.S. 521 (2011) ..................................................................... 39

*Spaulding v. United States*,
710 F. App'x 430 (11th Cir. 2018)............................................. 58

*State v. Cromartie*,
No. 94-CR-328 (Thomas Cty. Ga. Sept. 14, 2019)................. 23-24, 26, 45

*State v. Fed. Def. Program, Inc.*,
882 S.E.2d 257 (Ga. 2022)......................................................... 22

*State v. Lance*,
No. 98-cr-0036 (Jackson Cty., Ga. Sept. 30, 2019)..................... 24, 26, 51

*State v. Meders*,
No. 8700763 (Glynn Cty., Ga. Jan. 9, 2020)............................. 24, 25, 51

ix

## Cases—continued

*State v. Noling,
  75 N.E.3d 141 (Ohio 2016) .............................................. 27, 30, 32-34, 38

*State v. Wilson,
  No. 39249B (Baldwin Cty., Ga. May 30, 2019)......................24, 26, 50, 51

Stephenson v. Wilson,
  619 F.3d 664 (7th Cir. 2010) ................................................................. 30

Strickland v. Washington,
  466 U.S. 668 (1984) ................................................................. 49, 50, 59

Swipies v. Kofka,
  419 F.3d 709 (8th Cir. 2005) ................................................................. 47

Tazoe v. Airbus S.A.S.,
  631 F.3d 1321 (11th Cir. 2011) ............................................................. 58

Thigpen v. Bibb Cnty., Ga., Sheriff's Dep't,
  223 F.3d 1231 (11th Cir. 2000) ............................................................. 19

Timberlake v. State,
  271 S.E.2d 792 (1980).......................................................................... 21

U.S. Dep't of Agric. v. Moreno,
  413 U.S. 528 (1973) ......................................................................... 31, 32

United States v. Skrmetti,
  605 U.S. 495 (2025) ............................................................................. 28

White v. State,
  814 S.E.2d 447 (Ga. App. 2018) ........................................................... 27

Wiggins v. Smith,
  539 U.S. 510 (2003) ............................................................................. 49

Williams v. Illinois,
  399 U.S. 235 (1970) ................................................................. 28, 29, 30

Williams v. Taylor,
  529 U.S. 362 (2000) ............................................................................. 49

Wolff v. McDonnell,
  418 U.S. 539 (1974) ............................................................................. 40

Woodson v. North Carolina,
  428 U.S. 280 (1976) (plurality opinion) ............................................... 38

x

## Cases—continued

*Wroblewski v. City of Washburn,*
  965 F.2d 452 (7th Cir. 1992) .................................................................. 35

*Young v. Grand Canyon Univ., Inc.,*
  57 F.4th 861 (11th Cir. 2023)................................................................. 19

## Constitutional Provisions and Statutes

*U.S. Const. amend. VIII ............................... 3, 4, 11, 12-13, 15, 17-19, 55-59

*U.S. Const. amend. XIV ..........2-3, 11-14, 16-19, 28-32, 34-35, 37-47, 57-58

18 U.S.C.
  § 3600(a)(8) ......................................................................................... 51
  § 3600(a)(10) ....................................................................................... 43

28 U.S.C.
  § 1291.................................................................................................... 3
  § 1331.................................................................................................... 3

42 U.S.C. § 1983 ........................................................................................ 3, 11

42 Pa. Stat. § 9543.1(a)(4)............................................................................. 44

Ala. Code § 15-18-200(f)(1)(d) ...................................................................... 42

Alaska Stat. Ann. § 12.72.020(b) .................................................................. 43

Fla. Stat. Ann. § 925.11(1)(b)........................................................................ 42

O.C.G.A.
  § 5-5-41(a) ...................................................................4, 21, 23, 25, 45
  § 5-5-41(b) ............................................................................................ 4, 47
  *§ 5-5-41(c)............................. 1, 3-5, 8-11, 15, 23, 25, 31-32, 36-37, 45, 47

Tenn. Code Ann. § 40-30-304....................................................................... 44

Tex. Code Crim. Proc. Art. 64.03(a)(2) ....................................................... 44

## Other Authorities

Fed. R. Civ. P. 8(a)(2)................................................................................... 18

Fed. R. Civ. P. 12(b)(6)........................................... 13, 17-18, 35-36, 47, 53

Georgia Bill History, 2003 Reg. Sess. S.B. 119 ........................................... 38

**Other Authorities—continued**

Melissa Rife, *Criminal Procedure: Searches and Seizures: Provide Extraordinary Appeals and Motions for New Trial Based on Request for DNA Testing and Analysis; Establish Procedure for Preservation of Evidence*, 20 Ga. St. U. L. Rev. 119 (2003) ....................................................................................... 31

**INTRODUCTION**

With "an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty," DNA testing has "the potential to significantly improve both the criminal justice system and police investigative practices." *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 55 (2009). Mindful of the transformative power of DNA evidence and of their duty to administer fair and equal justice, all states have enacted legislation enabling prisoners to seek new DNA testing to obtain evidence establishing their innocence and/or mitigate their sentence. Georgia is no exception. *See* O.C.G.A. § 5-5-41(c). For those in Georgia sentenced to death, though, the statutory right to pursue DNA testing is illusory. In their finality, death penalty cases demand the greatest certainty, yet Georgia law puts the promise of DNA evidence the furthest from reach in these cases.

John Esposito discovered as much when he invoked his right under Georgia law to obtain DNA evidence. Mr. Esposito was convicted of murder and sentenced to death based on the State's view that he was more culpable for the crime than his codefendant. He now seeks DNA evidence that would show the opposite is true and thereby support a lesser sentence to match his lesser culpability.

But, despite having a meritorious claim, Mr. Esposito's request was denied, based on requirements in Georgia law that uniformly prevent death-

1

sentenced individuals from obtaining DNA testing. Georgia law rigidly bars motions made "for the purpose of delay"—a dispositive barrier to testing that applies in practical effect only to death-sentenced individuals with a future execution to delay—without regard for the merits of the motion. That standard is doubly burdensome because, as Georgia courts have construed it, a motion's "purpose" is determined solely by its timing. Georgia courts, moreover, apply an excessively stringent standard in assessing whether the DNA evidence sought would have a reasonable probability of changing the outcome of a capital sentencing trial—a standard that puts the promise of DNA testing beyond reach for death-sentenced individuals seeking to over-turn their sentences irrespective of the potential for new evidence to establish the defendant's lesser culpability. Mr. Esposito is not alone—on the contrary, that is just how Georgia law works. Mr. Esposito is one of several death-sentenced individuals whose motions for post-conviction DNA testing have been denied on the same grounds, and to counsel's knowledge, since its inception, *no* capital defendant has prevailed in a contested case for DNA testing. Despite having created the right to DNA testing, Georgia law makes it virtually impossible for those sentenced to death to vindicate that right.

Georgia's approach is unconstitutional on its face. The State cannot subject only those on death row to a dispositive "delay" provision that is a near-absolute bar to obtaining DNA testing. Nor can it, consistent with due

2

process and the Eighth Amendment, create a statutory right to DNA testing yet make obtaining testing so difficult for those with death sentences as to render the right illusory. Because Mr. Esposito plausibly pleaded constitutional violations, the Court should reverse the district court's Rule 12(b)(6) dismissal.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 over Mr. Esposito's claims brought under 42 U.S.C. § 1983. It entered judgment dismissing the complaint on July 31, 2025. Mr. Esposito timely noticed his appeal on August 29, 2025. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE STATEMENT

1. Whether the district court erred in dismissing Mr. Esposito's claim that Georgia's DNA testing statute (O.C.G.A. § 5-5-41(c)) violates the Equal Protection Clause because it imposes a burdensome "purpose of delay" provision that effectively applies only to those sentenced to death.

2. Whether the district court erred in dismissing Mr. Esposito's claims that Georgia's DNA statute violates the Due Process Clause because the purpose-of-delay provision and the reasonable-probability standard—as construed to apply in death penalty cases—render the statutory right to DNA testing illusory for death-sentenced individuals.

3

3. Whether the district court erred in dismissing Mr. Esposito's claims that Georgia's DNA testing statute facially violates the Eighth Amendment because the purpose-of-delay provision and reasonable-probability standard are virtually impossible for death-sentenced individuals to satisfy, creating an intolerable risk that people will be wrongfully executed.

## STATEMENT OF THE CASE

### A.    Legal background

Georgia law provides individuals convicted of felonies with one opportunity to file an "extraordinary motion for new trial" (EMNT) challenging the conviction and/or sentence beyond 30 days after the entry of judgment. *See* O.C.G.A. § 5-5-41(a)-(b). In 2003, the Georgia legislature amended the EMNT statute to create procedures for seeking post-conviction DNA testing, "[s]ubject to the provisions of subsections (a) and (b) of this Code section . . . ." O.C.G.A. § 5-5-41(c).

Relevant here, a movant for DNA testing must state, and the court must find, that the "motion is not filed for the purpose of delay" (the "purpose-of-delay provision"). O.C.G.A. §§ 5-5-41(c)(4), (c)(7)(d). Additionally, the movant must establish that the "requested DNA testing would raise a reasonable probability that the petitioner would have been acquitted if the results of the DNA testing had been available at the time of conviction, in light of all the evidence in the case" (the "reasonable-probability standard").

4

O.C.G.A. § 5-5-41(c)(3)(D). A death-sentenced individual challenging their sentence can establish entitlement to DNA testing by showing that there is a reasonable probability that the evidence would yield "a sentence less than death." *Crawford v. State,* 597 S.E.2d 403, 404 (Ga. 2004).

A court "shall grant the motion for DNA testing" if the movant makes all required showings. O.C.G.A. § 5-5-41(c)(7).

### B.    Factual background

In September 1996, Mr. Esposito and his then-girlfriend, Alicia Woodward, were arrested and charged with the murder of Lola Davis. R.1:6 ¶ 12.[2] Ms. Woodward and Mr. Esposito were accused of stealing Mrs. Davis's car, abducting her, then killing her with a tree limb. R.6-1:5.

Soon after Mrs. Davis's death, Mr. Esposito and Ms. Woodward were arrested and additionally accused of killing Larry and Marguerite Snider in Texas after abducting them in Oklahoma. R.1:6 ¶ 12. When arrested, Mr. Esposito gave an unrecorded statement to FBI agents purportedly claiming sole responsibility for all three murders and stating Ms. Woodward had nothing to do with them. R.1:6 ¶ 14.

Mr. Esposito recanted this confession well before trial. R.1:7 ¶ 15. Nonetheless, based solely on his confession, the State determined that Mr. Esposito, and not Ms. Woodward, beat Mrs. Davis and the Sniders to death.

---

[2]    Record cites are designated by R.[ECF number]:[banner page number].

The confession was the State's key evidence against Mr. Esposito because no physical or other evidence supports this theory. R.1:6 ¶ 14. The only physical evidence recovered linked both Ms. Woodward and Mr. Esposito to Mrs. Davis's car but provided no indication of their relative culpability for the murders. *Id.*

At trial, Mr. Esposito sought to establish that Ms. Woodward was the driving force behind the murders and committed the physical acts. R.1:7 ¶ 15. He showed that Ms. Woodward was physically larger than Mr. Esposito, suggesting she was more than capable of inflicting the victims' injuries. *Id.* He also showed that Ms. Woodward had driven the car and handled the money during their travels, suggesting she directed their activity. *Id.* Indeed, Ms. Woodward had made initial contact with Mrs. Davis. *Id.* Mr. Esposito produced testimony showing that he has a passive "follower" personality and it was consistent with his character to falsely confess to protect his girlfriend. *Id.*

Critically, however, Mr. Esposito lacked physical evidence to corroborate his defense, including exculpatory DNA evidence. R.1:7 ¶ 15. That lack of DNA evidence is not surprising, given the state of DNA testing technology then available. Indeed, much of the evidence was not subjected to DNA testing at all given technological limitations. R.1:7-8 ¶¶ 15, 18. In particular, because "touch DNA" testing did not yet exist, Mr. Esposito could not obtain

6

DNA evidence showing that Ms. Woodward, not he, touched evidence that would indicate she inflicted the victims' injuries. R.1:8 ¶ 18.

Because of the State's view of the relative culpability of Mr. Esposito and Ms. Woodward, the two defendants experienced very different outcomes in their prosecutions and sentences. In 1998, Mr. Esposito was tried and convicted by a jury and sentenced to death. R.1:6 ¶ 13. At sentencing, the prosecution emphasized Mr. Esposito's greater culpability, telling the jury he "did the physical beating." *Id.* ¶ 14. The jury, finding this narrative persuasive, sentenced Mr. Esposito to death. R.1:7 ¶ 16.

By contrast, after Mr. Esposito's conviction, the State allowed Ms. Woodward to plead guilty in exchange for a life sentence with the possibility of parole. R.1:6 ¶ 13. At her plea hearing, the prosecution justified the lesser sentence by noting her lesser culpability. *Id.* ¶ 14.

In short, the State's view of Mr. Esposito's greater culpability, based solely on his recanted confession, was the critical factor underlying his death sentence.

### C. Procedural background

#### 1. Post-conviction proceedings

Mr. Esposito's convictions and sentence were affirmed on direct review. *See Esposito v. State*, 538 S.E.2d 55 (Ga. 2000). He then pursued unsuccessful state and federal habeas challenges. *See Esposito v. Hall*, No.

7

S11E1608 (Ga. Mar. 19, 2012); *Esposito v. Warden*, 818 F. App'x 962 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2727 (2021).

### 2.    *Mr. Esposito's motion for DNA testing*

**a.** In the years since Mr. Esposito's trial, DNA technology has improved by leaps and bounds. R.1:8 ¶ 18. Recent advances in the collection, extraction, and analysis of DNA allow scientists to detect and evaluate infinitesimal amounts of genetic material. *Id*. Whereas Mr. Esposito could not establish his lesser culpability based on the limited DNA technology available during his trial and sentencing, recent advances now enable testing key evidence that could show that Ms. Woodward, not Mr. Esposito, was more culpable in the murders. *Id*. Such evidence, had it been available at trial, would likely have changed the sentencing verdict.

To that end, in 2021, Mr. Esposito invoked O.C.G.A. § 5-5-41(c), filing an EMNT and motion for DNA testing of five items that had not—and could not have—been performed during his trial: (1) the tree limb purportedly used to kill Mrs. Davis; (2) a small "cast off" piece of wood from which several hairs had been removed; (3) eyeglasses identified as Mrs. Davis's; (4) hairs from the crime scene previously identified as Mrs. Davis's; and (5) the tire iron allegedly used to kill the Sniders. R.1:10 ¶ 22.

Mr. Esposito argued testing would detect Ms. Woodward's DNA on these items, and not Mr. Esposito's. R.1:10 ¶ 22. That showing would

8

demonstrate Ms. Woodward's culpability and materially undermine the State's narrative. *Id.* At an evidentiary hearing, Mr. Esposito presented expert testimony from Dr. Maher Noureddine, Ph.D., an expert in forensic DNA evidence, who testified that significant advances had occurred in DNA testing since Mr. Esposito's trial. R.1:12 ¶ 25. Mr. Esposito also introduced documentary evidence and fact testimony from a Georgia Bureau of Investigation forensic scientist, Cynthia Seguin. *Id.* The State presented no witnesses. *Id.*

**b.** After post-trial briefing, the trial court informed the parties it would deny post-conviction DNA testing and requested a proposed order from the State. R.1:13 ¶ 29. The State provided a 17-page proposed order, which the court adopted verbatim. R.1:14 ¶ 30; R.6-1:9-25.

The order cited three grounds for denying the motion. Two are directly relevant here. *First,* the trial court held it was not established that "[t]he motion is not made for the purpose of delay" (O.C.G.A. § 5-5-41(c)(7)(D)), determining that Mr. Esposito "failed to prove that the technology required to perform his requested DNA testing has not been around for several years." R.1:15 ¶ 32; R.6-1:13.

*Second*, the court held there was not a reasonable probability that the conviction or sentence would have been different with the tested DNA evi-

9

dence. *See* O.C.G.A. § 5-5-41(c)(6)(E). It concluded there was not a reasonable probability of a different verdict because "the evidence of Defendant's guilt is overwhelming." R.1:15 ¶ 33; R.6-1:16. Regarding Mr. Esposito's death sentence, however, the court only remarked that "[t]here is no reasonable probability that the jury would have assumed [Mr. Esposito] was only present" and did not participate in the murders. *Id.*; R.6-1:22. Thus, it concluded, evidence that Ms. Woodward's DNA, and not Mr. Esposito's, was on the items tested would not likely support a lesser sentence. In so concluding, the court never considered the disparate sentences imposed on Ms. Woodward and Mr. Esposito—which rested on the very basis the court later rejected as implausible: that one defendant "stood by while [their] co-defendant beat [the victims] to death." R.6-1:24; R.1:6 ¶ 14. Nor, at any point, did the court consider whether a single juror could reasonably be swayed, which would undermine the juror unanimity required for a death sentence.

The trial court also held it was not established that "[t]he evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." (O.C.G.A. § 5-5-41(c)(7)(B)). R.6-1:10.

**c.** Mr. Esposito sought discretionary review from the Georgia Supreme Court. R.1:16 ¶ 34. After initially granting review, the court vacated

that order and dismissed the application for review. R.1:17 ¶ 35. It reprimanded the trial court for holding that the "chain of custody" requirement had not been satisfied because the trial court reached this conclusion by purposefully disregarding binding precedent from the Georgia Court of Appeals on the view that it was wrongly decided. *Id.* ¶ 36.*; see also Esposito v. State*, 881 S.E.2d 686, 688 (Ga. 2022).

The Georgia Supreme Court, however, dismissed the application, perceiving "no apparent reversible error in the trial court's" holdings related to the purpose-of-delay provision and reasonable-probability standard. *Esposito*, 881 S.E.2d at 689.

### 3.    *Mr. Esposito's federal court complaint*

**a.** Mr. Esposito then filed this action under Section 1983, bringing facial constitutional challenges to O.C.G.A. § 5-5-41(c). The complaint alleges that the purpose-of-delay provision violates the Equal Protection Clause of the Fourteenth Amendment (Count I), the Due Process Clause of the Fourteenth Amendment (Count II), and the Eighth Amendment (Count III). It also alleges that the reasonable-probability standard, as construed by Georgia courts, violates due process (Count IV) and the Eighth Amendment (Count V). The complaint requests declaratory relief to that effect, plus an injunction requiring defendants to release the sought-after evidence for DNA testing. R.1:35-36.

The complaint alleges that the purpose-of-delay provision violates equal protection by treating those with death sentences differently from other prisoners seeking post-conviction DNA testing, as only death-sentenced individuals have something—a future execution—to "delay." R.1:21 ¶ 42. The complaint alleges that this disparate treatment "does not rationally promote any legitimate government interest" as it (1) does not "discourage frivolous last-minute litigation," an interest served by other elements of the statute; (2) counteracts the statute's "intended purpose—to prevent miscarriages of justice before they occur[;]" and (3) "provides less protection to the very defendants who face the most dire and irrevocable of punishments and whose cases, accordingly, deserve greater scrutiny, not less." *Id.*

The complaint also alleges that the purpose-of-delay provision violates the Due Process Clause of the Fourteenth Amendment by "mak[ing] it impossible for [death-sentenced individuals] to obtain DNA testing if a court deems their request to have been filed too late—regardless of the materiality of the potential evidence" (R.1:23 ¶ 46) or the "reasonable grounds to delay filing," such as to await technological improvement in DNA technology (R.1:28 ¶ 53), particularly considering that the statute expressly permits only one EMNT to be filed. The complaint further alleges that the provision violates the Eighth Amendment by "creat[ing] an unacceptable risk

12

that a capital defendant will be executed in spite of evidence that would likely have resulted in a lesser sentence." R.1:30 ¶ 56.

Regarding the reasonable-probability standard, the complaint alleges that this provision, as authoritatively construed by Georgia courts in cases challenging a death sentence, violates due process by "mak[ing] it virtually impossible to establish the right to DNA testing." R.1:30 ¶ 57. It does so by "discount[ing] the mitigating potential of exculpatory evidence" and failing to consider the evidence's "impact on the vote of a single juror." R.1:33 ¶ 61. The complaint likewise alleges that the reasonable-probability standard, as applied in capital cases, violates the Eighth Amendment by "creat[ing] an unacceptable risk that DNA testing that could undermine the reliability of the death sentence will be denied," leading defendants to be executed un-justly. R.1:34 ¶ 63.

**b.** Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). R.6. The district court granted the motion. R.12.

Regarding equal protection, the district court held that the complaint "fails to allege that any 'disparate treatment' contained in the statute is not rationally related to a legitimate government interest." R.12:12. It con-cluded that the Georgia legislature could have created the purpose-of-delay provision to promote "finality and enforcement of its courts' criminal judg-

13

ments" by, for instance, "prevent[ing] death-row inmates from filing frivolous" motions. R.12:13-14. The court did not address Mr. Esposito's allegations explaining why the purpose-of-delay provision "does not rationally promote any legitimate government interest," including "discourag[ing] frivolous last-minute litigation." R.1:21 ¶ 42. Nor did it consider whether this interest justifies subjecting *only* death-sentenced individuals to a heightened standard.

The district court dismissed Mr. Esposito's due process counts challenging the purpose-of-delay provision and the reasonable-probability standard. R.12:16-22; R.12:26-30. Regarding the purpose-of-delay provision, it held that Mr. Esposito's claim was foreclosed by this Court's decision in *Cromartie v. Shealy*, 941 F.3d 1244, 1252 (11th Cir. 2019), though that case considered a different provision of Section 5-5-41. R.12:17-20. And it held that the reasonable-probability standard does not violate due process because "the trial court . . . concluded that, even if testing were permitted, and the results of that testing were favorable to [Mr. Esposito], it would not in reasonable probability convince a juror that Plaintiff did not actually commit the murders." R.12:29.[3] Like the trial court, the district court never con-

---

[3]    The court's description is inaccurate. As noted, the trial court's reasonable-probability analysis was not driven by doubt that a single juror would believe that Mr. Esposito did not commit the murders. Rather, in the trial

14

sidered that Ms. Woodward received a lesser sentence based on the prosecutor's comparative culpability assessment, which Mr. Esposito's DNA testing, if successful, would upend.

Finally, the district court dismissed Mr. Esposito's Eighth Amendment counts. R.12:22-25; R.12:30-32. It held that Mr. Esposito's theory would "expan[d] . . . the scope of the Eighth Amendment to include a post-conviction right to access evidence," but "that right does not exist." R.12:24. In so holding, the court disregarded the core Eighth Amendment prohibition against arbitrary and capricious infliction of the death penalty, finding this protection "limited to how the decision to impose a capital sentence is reached and what procedures are used to execute a prisoner" and thus inapplicable to post-conviction DNA testing. R.12:25.

This appeal followed.[4]

## SUMMARY OF ARGUMENT

Dismissal should be reversed. Mr. Esposito plausibly alleged that two provisions of O.C.G.A. § 5-5-41(c) render the statute unconstitutional by making it functionally impossible for death-sentenced individuals to access

---

court's view, it was "implausible" that a jury would conclude that Mr. Esposito was present for the murder yet less culpable for it (R.1:21), even though the contrary narrative was the prosecutor's stated reason for offering Ms. Woodward a life sentence.

[4] The standard of review of all claims is *de novo*. *See infra* at 18-19.

15

their right to DNA testing. In holding otherwise, the district court misread the complaint, misconstrued Georgia law, and misapplied the motion-to-dismiss standard. It did so, moreover, in reliance on arguments defendants never made and that, accordingly, Mr. Esposito had no opportunity to oppose.

**I.** Mr. Esposito has plausibly alleged the purpose-of-delay provision violates equal protection. It does so by making dispositive the motion's timing, no matter how meritorious the claim, by presuming that any motion not filed as soon as possible must be for the purpose of delay. This pressure to file a DNA-testing motion early is particularly perilous because, under the statute, there is only *one* opportunity to seek testing. This limitation forces those seeking DNA testing to make the impossible choice between filing a motion quickly (potentially missing out on further advances in DNA technology) or waiting too long.

Yet only those serving death sentences have something to "delay"—their execution—meaning the law imposes a burden on death-sentenced individuals not shared by other prisoners. This categorization does not rationally relate to a legitimate government interest because, as the complaint describes, there is no rational relationship between preventing frivolous DNA motions and requiring death-sentenced individuals alone to clear a

16

higher threshold for obtaining testing. In holding otherwise, the district court disregarded the Rule 12(b)(6) standard.

**II.** The complaint plausibly alleges that both provisions violate the Due Process Clause by rendering illusory the right under state law to obtain DNA testing. The purpose-of-delay provision fundamentally fails to vindicate that right by imposing a dispositive timing requirement making testing practically impossible to obtain. Georgia's approach is much more burdensome than the closest comparable provisions in regimes previously approved by the Supreme Court and this Court.

The reasonable-probability standard likewise erects such a high barrier to obtaining testing as to make the right to DNA testing illusory. As construed by Georgia courts in the context of capital-sentencing challenges, the provision discounts the mitigating value of evidence establishing the defendant's lesser culpability and the possibility that a single juror may be swayed by such evidence. This approach makes Georgia's law far more restrictive than the materiality standards previously found constitutional by the Supreme Court and this Court.

The district court's reasons for dismissal misapply precedent and fail to engage with the realities of Georgia law.

**III.** The complaint plausibly alleges that both provisions violate the Eighth Amendment because they create an untenable risk of arbitrary and

17

capricious executions. The district court was wrong to hold that the Eighth Amendment offers no protection to death-sentenced individuals between sentencing and execution, much less to make that holding without providing Mr. Esposito an opportunity to respond to it.

## ARGUMENT

Mr. Esposito's complaint plausibly alleges violations of equal protection, due process, and the Eighth Amendment. The complaint details how Georgia's DNA statute makes obtaining DNA testing practically impossible for death-sentenced individuals. Those allegations are more than enough to state plausible claims for relief. The district court's order of dismissal was error.

This Court reviews *de novo* a district court's order of dismissal under Rule 12(b)(6). *See, e.g.*, *Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*, 147 F.4th 1341, 1346 (11th Cir. 2025). To survive a motion to dismiss, a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The Court must accept the allegations as true and "construe them in the light most favorable to the plaintiff." *Id.* (cleaned up) (quoting *Cavalieri v. Avior Airlines C.A.*, 25 F.4th 843, 847 (11th Cir. 2022)). A complaint should not be dismissed if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face"—that is, it "allows the court to

18

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1346-1347 (quoting *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 867 (11th Cir. 2023)). Plausible facts "raise a reasonable expectation that discovery could supply additional proof of [the defendant]'s liability." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).

The complaint easily satisfies this standard for each of Mr. Esposito's equal protection, due process, and Eighth Amendment claims.

## I.   THE COMPLAINT PLAUSIBLY ALLEGES THAT THE PURPOSE-OF-DELAY PROVISION VIOLATES THE EQUAL PROTECTION CLAUSE.

The complaint plausibly alleges that Georgia's purpose-of-delay provision violates equal protection. *See* U.S. Const. amend. XIV § 1. "The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1233 (11th Cir. 2022) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). States must "govern impartially" and "may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." *Lehr v. Robertson*, 463 U.S. 248, 265 (1983). To state a claim, a plaintiff "need only allege that through state action, similarly situated persons have been treated disparately." *Thigpen v. Bibb Cnty., Ga., Sheriff's Dep't*, 223

19

F.3d 1231, 1237 (11th Cir. 2000) *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

The complaint alleges these elements. It alleges that the purpose-of-delay provision, which Georgia courts have construed to block any motion that could have been brought sooner, erects a virtually absolute bar to obtaining DNA testing *only* for those sentenced to death. That is because only those with a future execution have something to delay. The complaint plausibly alleges that this disparate treatment serves no legitimate government purpose—allegations the district court impermissibly discredited.

### A.    The purpose-of-delay provision imposes a uniquely heavy burden on death-sentenced individuals.

Two Georgia provisions combine to render DNA-testing motions effectively unavailable for death-sentenced individuals: courts treat the motion's timing as dispositive evidence of a "purpose to delay" but individuals may only file one such motion. Put together, this imposes a uniquely insurmountable Hobson's choice for death-sentenced individuals.

**1.** Georgia courts view the motion's timing as dispositive evidence of intent to delay, although the two are often unrelated.

**a.** As Georgia courts have construed the purpose-of-delay provision, a DNA-testing motion's timing determines whether it was filed "for the purpose of delay," with no regard for the motion's merits or various considerations possibly impacting its timing. As fully explained below, however, this

showing has relevance *only* in death-penalty cases, where there is something (an execution) to delay. *See infra* at 27-29.

Mr. Esposito's case illustrates the problem.[5] The trial court concluded that Mr. Esposito made his motion for the "purpose of delay" based on one factor: the motion's timing. Under the court's reasoning, because it determined Mr. Esposito could have filed the motion earlier, its purpose must have been to delay. R.6-1:15.

The trial court conflated its inquiry into the motion's "purpose" with a jurisprudentially crafted "due diligence" requirement derived from a separate portion of the EMNT statute, O.C.G.A. § 5-5-41(a), requiring "good reason" for moving more than thirty days after trial. R.6-1:13. (citing *Bharadia v. State,* 774 S.E.2d 90, 96 n.11 (Ga. 2015)). Georgia courts have interpreted this latter provision to require (among other things) that the late discovery of evidence motivating the motion "was not owing to the want of due diligence that he did not acquire it sooner." *Bharadia,* 774 S.E.2d at 92 n.1 (quoting *Timberlake v. State*, 271 S.E.2d 792, 795 (1980)).

---

[5]   As the district court noted, Mr. Esposito raises only a facial challenge to Georgia law and has "specifically disclaimed" any as-applied challenge. R.12:9 n.4. Mr. Esposito's claims thus do not implicate the *Rooker-Feldman* doctrine—allegations related to his case only illustrate how Georgia courts have authoritatively construed the DNA statute. *Cf. Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

The purpose-of-delay provision is dispositive—a DNA-testing motion fails if this requirement is not satisfied. Thus, combining this provision with the due diligence requirement, as Georgia courts do in capital cases, makes DNA testing practically impossible to obtain for those sentenced to death. If the court determines the defendant could have moved for DNA testing at an earlier time, the court will automatically deem his *future* purpose to be delay of his execution, without regard to any reasonable justifications for waiting—such as the desire to ensure that testing technology is as advanced as possible given the limited availability of testable material and the limitation to filing one EMNT.

So it was for Mr. Esposito. The trial court denied his motion because it determined the necessary DNA technology was available several years prior to his motion. R.6-1:15. In other words, because the court believed Mr. Esposito *could* have acted sooner, it concluded that his purpose was delay, without considering whether the motion was meritorious or the surrounding circumstances.

*Had* Georgia law allowed the court to consider the surrounding circumstances, it would have been clear Mr. Esposito's purpose was not delay. At the time, an agreement prevented the State from seeking a warrant for Mr. Esposito's execution—an agreement that remains in force today. R.1:19 ¶ 40; *see also State v. Fed. Def. Program, Inc.,* 882 S.E.2d 257, 288 (Ga. 2022)

22

(affirming injunction requiring State to refrain from seeking warrants for certain executions based on same agreement). Mr. Esposito's motion *could not* have been for the purpose of delay—there was no execution to delay. Nonetheless, applying Georgia law, the trial court believed Mr. Esposito filed his motion "for the purpose of delaying his imminent execution" simply because the court concluded he could have filed earlier. R.6-1:12.

**b.** Georgia courts are aligned in their construction of the purpose-of-delay provision. In dismissing Mr. Esposito's appeal, the Georgia Supreme Court endorsed the trial court's purpose-of-delay analysis; it perceived "no apparent reversible error in the trial court's" reasoning. *Esposito,* 881 S.E.2d at 689. That holding, immediately after reprimanding the court for a separate legal error (*see supra* at 10-11), reflects the Georgia Supreme Court's view that the trial court accurately applied Georgia law.

Other Georgia trial courts likewise have treated the DNA-testing motion's timing as dispositive proof of purpose and similarly conflate the judge-made, backwards-looking due diligence requirement of O.C.G.A § 5-5-41(a) with the statutory, forward-looking purpose-of-delay provision of O.C.G.A. § 5-5-41(c)(7)(D). For instance, in *State v. Cromartie*, the trial court found the purpose-of-delay provision unsatisfied because the timing of the prisoner's request for DNA testing "show[ed] a lack of diligence." No. 94-CR-328 at 33 (Thomas Cty. Ga. Sept. 14, 2019); *see also id.* at 27-28 (holding the due

diligence standard controls the purpose-of-delay provision). Similarly, in *State v. Lance*, the trial court rejected a motion for DNA testing after "the Court f[ound] that Defendant did not diligently pursue his claim," meaning "the instant motion was filed for the purpose of delay." No. 98-cr-0036 at 16 (Jackson Cty., Ga. Sept. 30, 2019); *see also, e.g.*, *State v. Wilson*, No. 39249B at 9-10 (Baldwin Cty., Ga. May 30, 2019) (finding the purpose-of-delay provision unsatisfied based on the motion's timing);[6] *State v. Meders*, No. 8700763 at 9-12 (Glynn Cty., Ga. Jan. 9, 2020) (same).

The result is a near-impenetrable barrier against motions for DNA testing by death-sentenced individuals, even if the motion's timing has nothing to do with the purpose of its filing. In other words, a death-sentenced individual can bring a motion that, on its face, makes a very strong case for testing—which would, logically, suggest that obtaining testing is the motion's purpose—and yet, under Georgia law, the motion will be denied if the court concludes a capital defendant could have filed it sooner. That Kafkaesque standard makes testing unobtainable.

---

[6]    In *Wilson*, just as in Mr. Esposito's case, no warrant of execution had been issued at the time of his motion, and so there was no execution to delay. *See State v. Wilson*, Crim. No. 39249B (Baldwin Cty, Ga. June 5, 2019) (order scheduling execution). Nonetheless, based on the motion's timing alone, the court decided its purpose was to delay.

**2.** The rule that a prisoner may only file one motion for DNA testing, when combined with the timing-dispositive test read into the purpose-of-delay provision, pushes testing even further from reach for death-sentenced individuals.

The statute limits prisoners to filing one EMNT. *See* O.C.G.A. § 5-5-41(a). The DNA statute is "subject to [the same] provision[s]." *Id.* § 5-5-41(c)(1). The interplay between this rule and the purpose-of-delay provision puts death-sentenced individuals to an impossible choice. Prisoners must seek new DNA evidence at the earliest opportunity or risk their purpose being deemed delay. But given the rapid advance of DNA technology, a prisoner who files at the earlier opportunity may lose the benefit of future technological advances and may use up the available biological material in the process. The result is a Catch-22.

That problem is exacerbated by Georgia courts' refusal to consider movants' legitimate, non-delay-related reasons for filing when they did. Again, Mr. Esposito's motion is a case-in-point. Mr. Esposito explained his motion's timing was driven by, among other things, recent developments in DNA testing technology, a scientific field that is "continually advancing." R.1:12 ¶ 25; R.1:27 ¶ 52. And he supplied expert testimony to that effect. *Id.* at 25. Despite these showings, his purpose was deemed delay.

25

Other cases hold similarly. *See, e.g.*, *Lance*, No. 98-cr-0036 at 15 (Sept. 30, 2019) ("Though technology is constantly advancing and will always continue to evolve, the law also requires diligence in pursuing an extraordinary motion for new trial."); *Cromartie*, No. 94-CR-328 at 30-33 (Sept. 14, 2019) (similar); *Wilson*, No. 39249B at 9-10 (May 30, 2019) (similar).

### B. The purpose-of-delay provision imposes this dispositive barrier *only* on death-sentenced individuals.

Although the Equal Protection Clause requires the government to treat similarly situated people the same, Georgia's purpose-of-delay provision treats them differently; it imposes a dispositive barrier to DNA-testing motions only on those sentenced to death, not on similarly situated individuals serving non-death sentences.

**1.** The complaint plausibly alleges that prisoners with and without death sentences are similarly situated for the purposes of Georgia's DNA statute.

To determine whether two groups are similarly situated, courts "must look beyond the classification to the purpose of the law." *Johnson v. Smith*, 696 F.2d 1334, 1337 (11th Cir. 1983) (quoting Gunther, Constitutional Law at 678-679 (10th ed. 1980)). Here, the DNA statute provides death-sentenced individuals and other prisoners convicted of a felony the same substantive right to DNA testing. It requires both groups to invoke the same statutory procedure and meet the same statutory standards. Nothing about

26

the statute situates the two groups any differently with respect to the "purpose of the law." *Id. See, e.g.*, *White v. State*, 814 S.E.2d 447, 448 (Ga. App. 2018) (stating the law provides all those "convicted of felony offenses with the ability to request DNA testing . . . .").

In *State v. Noling*, the Ohio Supreme Court found these two categories of prisoners similarly situated for the purpose of the state's post-conviction DNA testing statute, as difference in sentence was "nearly irrelevant under the statute." 75 N.E.3d 141, 148 (Ohio 2016). The same applies here. Both groups "follow[ed] the same application process for DNA testing" and they had to meet the "same level of scrutiny in the trial court to obtain relief." *Id.*

**2.** The complaint plausibly alleges that the purpose-of-delay provision treats these similarly situated groups—death-sentenced individuals and non-death-sentenced individuals—differently.

As the complaint explains, the purpose-of-delay provision erects a dispositive barrier to testing only for those with death sentences. R.1:18 ¶ 39. Though the statute does not expressly call for differential treatment, the concept of "delay" has no application for prisoners without death sentences, as without a possible execution they have nothing to delay. *Id.* For instance, the trial court in Mr. Esposito's case understood the purpose-of-delay provision to be relevant to determine whether he filed the motion "for the purpose

of *delaying his imminent execution.*" *Id.* (emphasis added). Indeed, under-signed counsel are unaware of any case in which a Georgia court has applied the purpose-of-delay provision to deny a non-death-sentenced individual's DNA motion.

"[A] State may not circumvent the Equal Protection Clause by writing in abstract terms . . . ." *United States v. Skrmetti*, 605 U.S. 495, 514 (2025). A "covert" classification is a classification all the same, no matter if it is "neutral on its face." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 274 (1979) (assessing whether a statute "establishe[d] a classification that is overtly or covertly based upon gender").

That rule is longstanding. In *Griffin v. Illinois*, a facially neutral state law violated equal protection where, in effect, it classified defendants based on their ability to pay costs necessary to pursue appeals. 351 U.S. 12, 17-18 (1956); *see also id.* at 17 n.11 ("[A] law nondiscriminatory on its face may be grossly discriminatory in its operation."). Similarly, in *Williams v. Illinois*, a facially neutral statute created "two categories of persons" by extending a prisoner's term of incarceration "based upon financial inability to pay a fine and court costs," notwithstanding that "[o]n its face the statute extends to all defendants an apparently equal opportunity" to pay those fines. 399 U.S. 235, 236, 242 (1970); *see also, e.g., M.L.B. v. S.L.J.*, 519 U.S. 102, 127 (1996) (laws implicate the Equal Protection Clause when they "'[v]isit different

consequences on two categories of persons,' . . . apply[ing] to all" in one category and not "reach[ing] anyone outside that class") (quoting *Williams*, 399 U.S. at 242).

Georgia law creates "two categories of persons." *Williams*, 399 U.S. at 242. The first is death-sentenced individuals, who, because they have *something* to delay, must prove delay is not their purpose. The second is prisoners without death sentences, who have nothing to delay and thus nothing to prove in this regard. This categorization is significant because, as discussed above (*see supra* at 20-26), courts consistently deny testing to death-sentenced defendants by concluding that, because the DNA motion could have been filed sooner, its purpose was dilatory.

**C.      This disparate treatment is not related to a legitimate government purpose.**

The district court did not dispute the points above. Rather, it concluded that the purpose-of-delay provision's disparate treatment is rationally related to a legitimate government interest. That is wrong and contradicts Mr. Esposito's well-pleaded, plausible allegations.

**1.** The complaint plausibly alleges that subjecting death-sentenced individuals to a higher standard does not serve a legitimate government purpose. As the complaint alleges, the disparate treatment is not rationally related to "discourag[ing] frivolous last-minute litigation," contradicts the statute's "intended purpose—to prevent miscarriages of justice before they

29

occur," and "provides less protection to the very defendants who face the most dire and irrevocable of punishments and whose cases, accordingly, deserve greater scrutiny, not less." R.1:21 ¶ 42. These allegations, entitled to a presumption of truth (*see Caterpillar Fin. Servs. Corp.*, 147 F.4th at \*8), are well-pleaded and plausible. They are sufficient, at this stage, to state a constitutional claim.

*First*, the State's interest in preventing frivolous litigation is not rationally served by subjecting *only* death-sentenced individuals to heightened standards. *See, e.g.*, *Williams*, 399 U.S. at 241 ("[T]he Court has had frequent occasion to reaffirm allegiance to the basic command [of the Equal Protection Clause] that justice be applied equally to all persons.").

If anything, the State's interest in preventing frivolous motions is greater in *non*-death penalty cases, where wrongly denying a motion does not risk wrongful execution. *Cf.*, *e.g.*, *Stephenson v. Wilson*, 619 F.3d 664, 668 (7th Cir. 2010) (rejecting approach that would "produce the paradox that capital defendants would have less protection . . . than persons convicted of lesser crimes and facing milder punishment"); *Hammond v. Com.*, 366 S.W.3d 425, 430 (Ky. 2012) (rejecting rule with the "consequence . . . that a defendant facing the death penalty would have *less* protection . . . than a non-capital defendant"); *Noling*, 75 N.E.3d at 148 (rejecting "the generic expeditious enforcement" of state court judgments as a

30

"faulty" rationale for imposing more burdensome rules on death-sentenced individuals). Yet Georgia takes the opposite approach. A law will not survive rational basis review when, even if directed at rational concerns, its "practical operation" does not "constitute[] a rational effort to deal with these concerns." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 536, 538 (1973).

*Second*, the State's interest is served by other, non-discriminatory provisions of the DNA statute. *See Moreno*, 413 U.S. at 536 (holding law violated equal protection, under rational basis scrutiny, where statute "contains provisions, wholly independent of" the challenged provision, "aimed specifically at the problems" the government claimed to be addressing).

For instance, the DNA statute states that filing a motion does not automatically stay an execution (*see* O.C.G.A. § 5-5-41(c)(2)), which prevents frivolous motions from causing delay.[7] And the law imposes additional requirements preventing frivolous motions, including the numerous substantive showings a movant must make to obtain DNA testing (*id.* §§ 5-5-

---

[7]    According to the bill's sponsor, this provision was designed to "ensure that defendants file their motions as soon as possible." Melissa Rife, *Criminal Procedure: Searches and Seizures: Provide Extraordinary Appeals and Motions for New Trial Based on Request for DNA Testing and Analysis; Establish Procedure for Preservation of Evidence*, 20 Ga. St. U. L. Rev. 119, 122 & n.27 (2003).

41(c)(3), (7)), including that "the evidence sought to be tested is material" (*id.* § 5-5-41(c)(7)(G)).

And *third,* the State's approach—requiring death-sentenced individuals to satisfy a higher showing than others—contradicts the DNA statute's clear purpose: to provide *all* prisoners convicted of a felony an opportunity to obtain DNA evidence where warranted. Indeed, legislative history suggests that the primary population of prisoners intended to benefit were "person[s] … sentenced for a capital crime." Georgia Bill History, 2003 Reg. Sess. S.B. 119 (bill title).

When a statutory provision is "directly contrary to the [act]'s basic purpose" (*Raidoo v. Moylan*, 75 F.4th 1115, 1121-1122 (9th Cir. 2023)), or is "clearly irrelevant to the stated purposes of the Act" (*Moreno*, 413 U.S. at 534), it fails rational basis review. These concerns are especially relevant here, where the government's action is a matter of life and death. *See, e.g.*, *Noling*, 75 N.E.3d at 148 (notwithstanding the government's interest in "expeditious enforcement" of judgments, the need for "certainty" is especially significant in death-penalty cases).

Allegations like these adequately state a claim that the statute does not pass muster under rational basis review. The Ohio Supreme Court in *Noling*, applying that standard, concluded that a similar DNA statute vio-

lated equal protection by imposing a unique burden on death-sentenced individuals. 75 N.E. 3d at 148-150. There, Ohio's DNA testing statute required capital offenders whose DNA-testing motions were denied—but not other offenders—to seek discretionary review from the state supreme court rather than direct appeal to the intermediate appellate court. *Id.*

The court concluded that subjecting capital offenders to this special burden did not rationally relate to "ensuring that the final judgments of [Ohio] courts are expeditiously enforced," as "certainty" is critical in cases involving "the extinguishing of a human life," and, moreover, the statute's approach would not result in "expedience," but would "subvert[]" it. *Noling*, 75 N.E. 3d at 148. Nor did the Court find the State's interest in preventing "delay" or the need to "promote[] consistency" plausible justifications. *Id.* at 150.

*Noling* maps powerfully onto this case. Here, just as there, Georgia's purpose-of-delay provision imposes a higher burden to obtain DNA testing on those with death sentences than those without. *See supra* at 27-29. But the State's only asserted justification for that disparate treatment—the need to prevent frivolous last-minute litigation or otherwise promote "expeditious enforcement" of judgments (*Noling*, 75 N.E 3d at 148)—does not rationally relate to such disparate treatment. Nor does the law have that effect, given that other provisions already serve those purposes. *Supra* at 31-

32. On the contrary, given the special need for "certainty" (*id.*) in death-penalty cases, the statute's approach is manifestly irrational.

Contrary to the district court's holding (R.12:15), *Noling* strongly supports Mr. Esposito's claim. The court discounted *Noling* because this case, unlike *Noling*, does not involve "an allegedly discriminatory statutory scheme for pursuing appeals." R.12:15. But that distinction is immaterial. Though this case does not concern *appeals*, it does involve an "allegedly discriminatory statutory scheme" (*id.*) that, as in *Noling*, subjects death-sentenced individuals to more demanding requirements in an identical context: post-conviction DNA testing. The *Noling* court rejected the very justification the district court endorsed below: the State's interest in the expeditious enforcement of its judgments. Although not binding, *Noling* is directly on point. The district court's failure to grasp its reasoning underscores the flaws in its conclusion that Mr. Esposito has not stated a plausible equal protection claim.

**2.** The district court, concluding that the purpose-of-delay provision satisfies rational basis, made several legal errors.

*First*, the district court improperly applied the motion-to-dismiss standard. The complaint contains well-pleaded, plausible allegations that there is no rational basis for the statute's disparate treatment of death-sentenced individuals. But the court disregarded these allegations, concluding

that Mr. Esposito "fail[ed] to allege that any 'disparate treatment' contained in the statute is not rationally related to a 'legitimate government purpose.'" R.12:12. He alleged exactly that. R.1:21 ¶ 42; *see also supra* at 29-32.

Courts have repeatedly recognized that the "rational basis standard . . . cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard." *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022) (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992)); *see also Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008) (same); *Brown v. Zavaras*, 63 F.3d 967, 972 (10th Cir. 1995) (same); *cf. Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012) (equal protection claim survives a motion to dismiss where the allegations show it is "certainly not speculative and indeed plausible" that the State will "disparately treat" individuals).

To be sure, rational-basis review is demanding, and Rule 12(b)(6) requires more than just "conclusory" allegations that the complained-of action is "not rationally related to any legitimate government interest." *Giarratano*, 521 F.3d at 304 (affirming dismissal on this basis). Nonetheless, the complaint need only "plead[] facts plausibly showing a challenged policy's irrationality." *Sanchez*, 45 F.4th at 396. The complaint clears that threshold. *See supra* at 29-32. Mr. Esposito is entitled to discovery to further develop this showing.

The court mistook Mr. Esposito's argument to mean that a court can *never* apply rational basis review at the motion-to-dismiss stage. R.12:12 n.5. That is not his argument. Rather, dismissing Mr. Esposito's complaint for failing to allege that the purpose-of-delay provision serves no legitimate purpose violates the 12(b)(6) standard because Mr. Esposito did exactly that. Accordingly, the cases the court cited (*id.*) are distinguishable. In *Leib v. Hillsborough County Public Transportation Commission,* for example, the district court properly "assum[ed] that all of [the plaintiff's] allegations were true," but concluded that these allegations, taken as true, failed to overcome rational basis. 558 F.3d 1301, 1306 (11th Cir. 2009).

Here, by contrast, the district court did not take Mr. Esposito's allegations as true; it expressly contradicted some while disregarding others. For instance, though the complaint alleged facts demonstrating that the statute's disparate treatment does not relate to the government's interest in preventing "frivolous" motions (R.1:21 ¶ 42), the court nonetheless held that Georgia's statute is justified by "[t]he desire to prevent death-row inmates from filing frivolous § 5-5-41(c) motions" (R.12:14). That direct contradiction of the complaint runs headlong into the 12(b)(6) standard.

*Second*, the court misapplied rational basis review by overlooking that, to sustain disparate treatment of two groups, the *unequal treatment* must be related to a legitimate government purpose. "[I]t is not sufficient

for the state action merely to serve some legitimate government purpose." *Newman Marchive P'ship, Inc. v. Hightower*, 349 F. App'x 963, 965 (5th Cir. 2009). "Instead, there must be some rational basis for the *classification*, which must serve legitimate state ends." *Id.*; *accord Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1325 (11th Cir. 2019) (equal protection requires "a rational relationship between the *disparity of treatment* and some legitimate government purpose") (emphasis added).

The district court held the statute serves the legitimate government purpose of "timely enforcement of a sentence." R.12:13. But it never explained how this interest relates to imposing a special burden on death-sentenced individuals. It made only the conclusory remark that "the desire to prevent death-row inmates from filing frivolous § 5-5-41(c) motions in order to delay their execution is certainly a rational basis for the distinction purportedly drawn by the statute." R.12:13. Yet the complaint specifically alleges facts showing that the statute is not rationally related to preventing "frivolous" motions. R.1:21 ¶ 42.

Rather, as the complaint alleges—but the district court refused to credit—there is no legitimate government interest in making DNA evidence more difficult to obtain for death-sentenced individuals than others. That is the *opposite* of how a DNA testing statute would rationally operate, considering the special interest in preventing wrongful executions and Georgia's

37

original intent to create an avenue of relief specifically for "person[s] … sentenced for a capital crime." Georgia Bill History, 2003 Reg. Sess. S.B. 119. Courts routinely demand greater protection in these circumstances, not less. *Accord Noling*, 75 N.E. 3d at 148 ("Chief among all cases that cry out for certainty are those that result in the extinguishing of a human life."); *see also, e.g.*, *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976) (plurality opinion) ("Death, in its finality" demands greater "reliability in the determination [of] the appropriate punishment in a specific case"); *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (similar) *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Sears v. Warden GDCP*, 73 F.4th 1269, 1300 (11th Cir. 2023) ("The Court has also reminded us that the 'qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.'") (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). The district court's justification for the statute's disparate treatment is at odds with the statute's purpose and the well-established need for reliability in death penalty cases.

\* \* \*

The complaint plausibly alleges that the purpose-of-delay provision violates equal protection. The district court's dismissal of the claim should be reversed.

## II.    THE COMPLAINT PLAUSIBLY ALLEGES THAT TWO PROVISIONS OF THE DNA STATUTE VIOLATE PROCEDURAL DUE PROCESS.

Mr. Esposito plausibly alleged violations of procedural due process in both the purpose-of-delay provision and the reasonable-probability requirement.

When a state provides prisoners an opportunity to obtain post-conviction DNA testing, this liberty interest in DNA testing is protected by procedural due process. *See, e.g.*, *Osborne,* 557 U.S. at 68; *see also Skinner v. Switzer*, 562 U.S. 521, 531-534 (2011) (Section 1983 due process claim properly challenges allegedly inadequate state DNA testing procedures). Here, Georgia law provides a substantive right to new DNA testing. Having created that right, Georgia may not, consistent with due process, institute procedures "fundamentally inadequate to vindicate" it. *Cromartie v. Shealy*, 941 F.3d 1244, 1252 (11th Cir. 2019) (quoting *Osborne*, 557 U.S. at 69). Mr. Esposito alleged that Georgia has done exactly that.

### A.    The purpose-of-delay provision renders illusory death-sentenced individuals' right under Georgia law to obtain DNA testing.

**1.** As described (*supra* at 20-26), the complaint plausibly alleges that the DNA testing statute is "fundamentally inadequate to vindicate" the state-created right to post-conviction DNA testing. *Cromartie*, 941 F.3d at

39

1252 (11th Cir. 2019). For those sentenced to death, relief under the statute is illusory.

A few points warrant reiteration. Especially troubling is the Catch-22 created by the interplay between the purpose-of-delay provision, construed to require litigants to file their motion as soon as feasible, and the one-motion limitation, which cautions against filing too soon and squandering that single opportunity. *See supra* at 25.

Frustrating the development of DNA evidence this way—despite nominally enshrining that right in state law—is the sort of shortcoming that, under *Osborne*, offends the "fundamental fairness" protected by the Due Process Clause by making the right illusory for death-sentenced individuals. 557 U.S. at 69. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 557, 563-566 (1974) (the State, "having created the right to good time" credit supporting parole, failed to apply procedures that "insure that the state-created right is not arbitrarily abrogated"); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("While the legislature may elect not to confer a [liberty] interest . . . , it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards"); *cf. Newton v. City of New York*, 779 F.3d 140, 150 (2d Cir. 2015) (city violated

40

due process by maintaining a "recklessly chaotic evidence management system" that "was so inadequate as to nullify th[e] procedures" for post-conviction DNA testing created by state law).

Additionally, the disparate treatment between capital and non-capital defendants (*supra* at 26-29) substantiates Mr. Esposito's due process theory. *See, e.g.*, *Beck v. Alabama*, 447 U.S. 625 (1980); *Hopkins v. Reeves*, 524 U.S. 88 (1998). Georgia's decision to place a heavier burden on death-sentenced individuals underscores the law's manifest unfairness, showing how it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." *Osborne*, 557 U.S. at 69. This defect is especially concerning given that capital defendants are due *greater* process, not less. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (greater procedural protections attach in capital cases given the "qualitative difference between death and all other penalties").

**2.** Georgia's purpose-of-delay provision also makes its DNA statute more restrictive than similar regimes approved in other cases. This Court has embraced a "comparative approach" to inform its due process analysis. *Cromartie*, 941 F.3d at 1253. Most significant is how Georgia's law compares with laws discussed in *Osborne*, 557 U.S. at 67-72 (Alaska's general post-conviction statute and the Federal DNA testing statute) or approved by this

41

Court in *Cunningham v. Dist. Attorney's Off. for Escambia Cnty.*, 592 F.3d 1237, 1263-1271 (11th Cir. 2010) and *Alvarez v. Att'y Gen. for Fla.*, 679 F.3d 1257, 1266 n.2 (11th Cir. 2012).[8]

Georgia is an outlier: Whereas none of these other states makes the timing of a death-sentenced individual's motion alone determinative of delay—with no regard for the claim's merits—Georgia does. This approach is "'inconsistent' with fundamental fairness" like no other law approved by the Supreme Court or this Court. *Cromartie*, 941 F.3d at 1253 (quoting *Cunningham*, 592 F.3d at 1263).

Florida's post-sentencing statute includes no time restrictions at all. Fla. Stat. Ann. § 925.11(1)(b) ("A petition for postsentencing DNA testing under paragraph (a) may be filed or considered at any time . . . ."); *see also Alvarez*, 679 F.3d at 1266 n.2 (noting that Florida's DNA testing statute compares favorably to the federal statute in this respect).

Alabama's post-conviction statute specific to capital offenses contains a purpose-of-delay provision, but, critically, does not consider delay in a vacuum. Rather, it directs the court to determine whether the motion's purpose is "demonstrating the actual innocence of the applicant and not to delay the

---

[8]  In *Alvarez*, the plaintiff's procedural due process challenge was barred by the *Rooker-Feldman* doctrine. 679 F.3d at 1262-1264. Nonetheless, the Court did opine on the statute's constitutionality in a lengthy footnote. 679 F.3d at 1266 n.2.

execution of sentence or administration of justice." Ala. Code § 15-18-200(f)(1)(d). In other words, unlike Georgia, Alabama's statute directs courts to consider the merits of a DNA-testing motion in determining its purpose.

The federal DNA statute requires motions to be "timely" (*see* 18 U.S.C. § 3600(a)(10)), but its closest analogue to the purpose-of-delay provision applies only to rebut the general presumption that a request for testing within 3 years is timely, and only when there is "clear and convincing evidence that the applicant's filing is done *solely* to cause delay or harass" (*id.* § 3600(a)(10)(A)(ii) (emphasis added)). Additionally, a presumption of untimeliness beyond three years can be rebutted by, *inter alia*, "newly discovered DNA evidence," "manifest injustice" based on "all facts and circumstances," or "good cause shown." *Id.* § 3600(a)(10)(B)(iv).

Alaska's general post-conviction statute—the statute considered in *Osborne*—is also more generous than Georgia's. *See* Alaska Stat. Ann. § 12.72.020(b). It contains no delay-specific provision. *Id.* Indeed, in finding that the statute satisfies due process, the *Osborne* Court noted that Alaska "exempts" certain post-conviction "claims from otherwise applicable time limits." 557 U.S. at 70. Alaska's law does contain a due diligence requirement (Alaska Stat. Ann. § 12.72.020(b)(2)) but, unlike Georgia's statute, does not conflate this requirement with a dispositive "delay" provision.

Other states' laws likewise do not make timing a rigid barrier to testing. Pennsylvania, for example, provides that "DNA testing may be sought at any time if the motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice." 42 Pa. Stat. § 9543.1(a)(4). Thus, delay is considered but not dispositive. A motion is only conceivably for the purpose of delay when not made to "demonstrat[e] the applicant's actual innocence." *Id.*; *see also Commonwealth v. Hardy*, 337 A.3d 385, 412 (Pa. 2025) (rejecting a delay analysis based on "purely temporal considerations" or "the mere passage of time."). Tennessee, likewise, makes DNA testing available if the "application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice." Tenn. Code Ann. § 40-30-304. So too Texas. *See* Tex. Code Crim. Proc. Art. 64.03(a)(2) (movant must show that "the person would not have been convicted if exculpatory results had been obtained through DNA testing" and "the request for the proposed DNA testing is not made to *unreasonably* delay the execution of sentence or administration of justice") (emphasis added). Unlike Georgia's statute, none of these states limit claimants to filing only one DNA motion.

**3.** The district court's contrary reasoning is erroneous. It misapplied precedent and misunderstood the due-process inquiry.

44

**a.** The district court largely dispensed with Mr. Esposito's due process argument, finding it "foreclose[d]" by this Court's "discussion in *Cromartie*." R.12:20-21. That was error.

*Cromartie* involved a challenge to a separate provision of the EMNT statute: the judge-made due-diligence requirement that applies in all EMNTs, whether based on DNA or other evidence. *See* 941 F.3d at 1255-1256. While the Court made passing reference to the purpose-of-delay provision (*id.* at 1254), it did not consider its constitutionality, and, indeed, the *Cromartie* plaintiff expressly conceded this provision was "appropriate." *See* Amended Complaint at 21, *Cromartie v. Shealy*, No. 7:19-CV-00181 (M.D. Ga. Oct. 28, 2019), Dkt. 11.

*Cromartie*'s approval of Section 5-5-41(a)'s jurisprudential due diligence requirement does not mean Section 5-5-41(c)'s separate purpose-of-delay requirement is permissible. *Cromartie* approved of the diligence requirement because it "is an established principle of law." 941 F.3d at 1256. The purpose-of-delay requirement, however, is a distinct factor that creates a virtually insurmountable barrier to testing for death-sentenced individuals. The provision, as interpreted, asks whether a prisoner acts with the purpose of delay—a forward-looking inquiry—by considering whether the prisoner was diligent, a backward-looking inquiry. And, in so doing, it

45

makes what previously occurred dispositive, leaving no room for other considerations to inform the purpose determination. This requirement was not at issue in the cases the *Cromartie* Court considered, and it is not required in other states' standards.[9] By concluding that a purpose of delay is shown by lack of diligence, Georgia courts have created a virtually unattainable standard that puts DNA testing for capital defendants beyond reach.

Additionally, *Cromartie* involved no allegation that any requirement applies unequally to death-sentenced individuals. The district court largely wrote off this aspect of Mr. Esposito's complaint because it rejected the equal protection claim (R.12:21), without considering how this discriminatory approach also violates procedural due process.

The district court also erroneously relied on dicta in *Cromartie* speculating that a plaintiff may bring multiple DNA-testing motions, irrespective of the provision specifying that only one EMNT is permitted. R.12:20 n.9 (citing *Cromartie*, 941 F.3d at 1256 n.9). On the contrary, the statute plainly states that DNA-testing motions are "subject to the provisions of" the EMNT

---

[9]   *Cromartie* mistakenly states that "[l]ike Alaska's [Georgia's statute] requires that the prisoner show he acted with due diligence *and without the purpose of delay*." 941 F.3d at 1254 (citing *Osborne*, 557 U.S. at 64). But, as explained (*supra* at 43), Alaska's statute never mentions delay, nor did *Osborne* discuss that concept.

46

statute. O.C.G.A. § 5-5-41(c)(1). That includes the one-motion rule of O.C.G.A. § 5-5-41(b).

*Cromartie* does not control the outcome here. Mr. Esposito's claim is thus "not so similar to those presented in . . . previous cases that his complaint can be dismissed on a Rule 12(b)(6) motion." *Arthur v. Thomas*, 674 F.3d 1257, 1261 (11th Cir. 2012).

**b.** The district court also stated that while "state law arguably creates a liberty interest in DNA testing for prisoners," the "boundaries of that liberty interest must be measured by the law itself." R.12:21. Accordingly, it reasoned, "the liberty interest in DNA testing does not, under the express terms of the statute, extend to inmates who cannot demonstrate that their motion is not made for the purpose of delay." R.12:22.

The Supreme Court has rejected this "tautology." *Loudermill*, 470 U.S. at 541; *see also id.* ("The answer to [what process is due] is not to be found in the [state] statute" but under federal due process principles. (quotation marks and citation omitted)). And it is incompatible with the standard in *Osborne*: If state law creates a liberty interest, then the procedures the state imposes cannot be "fundamentally inadequate to vindicate the substantive rights provided." 557 U.S. at 69; *see also, e.g.*, *Swipies v. Kofka*, 419 F.3d 709, 716 (8th Cir. 2005) ("[A] state statute cannot dictate what

47

procedural protections must attend a liberty interest—even a stated-created one—as this is the sole province of federal law.").

### B.    The reasonable-probability standard imposes an impossibly high standard for DNA testing in capital cases.

**1.** The complaint plausibly alleges that the reasonable-probability standard, as authoritatively construed by Georgia courts with respect to capital sentences, is practically impossible to satisfy and makes the promise of DNA testing to challenge a death sentence illusory. Georgia courts consistently fail to consider how DNA evidence showing the defendant's lesser culpability would likely mitigate the sentence or might impact a single juror.

**a.** Take Mr. Esposito's case. Mr. Esposito was sentenced to death because the State convinced the jury that he was more culpable than his codefendant, whereas the State allowed Ms. Woodward to plead guilty for life with possible parole based on her purported lesser culpability. The State was clear about this in the defendants' sentencing and plea hearings. R.1:7 ¶ 16. Mr. Esposito's jury accepted the State's narrative, while the trial court approved of Ms. Woodward's lesser sentence—results directly attributable to the allocation of culpability between the defendants. That allocation resulted from Mr. Esposito's withdrawn confession and the lack of evidence to rebut it. *Supra* at 5-7.

48

If Georgia law applied a reasonable-probability standard consistent with that seen in most other jurisdictions, Mr. Esposito's sought-after DNA evidence would clearly establish a "reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (citing *Williams v. Taylor,* 529 U.S. 362, 398-399 (2000)); *see also Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Green v. Georgia,* 442 U.S. 95, 97 (1979) (granting new sentencing phase where trial court erroneously excluded hearsay testimony that co-defendant committed the murder).[10] Physical evidence showing that Ms. Woodward, not Mr. Esposito, handled key items, including the murder weapons, would have subverted the State's narrative of relative culpability, likely producing a different sentencing result. R.1:7 ¶ 16.

Applying Georgia law, however, the trial court never considered the State's view of relative culpability. Nor did it consider how the evidence Mr. Esposito sought could influence a single juror's vote. It instead held there

---

[10]   Indeed, even in other contexts in *Georgia*, but not when death-sentenced individuals seek new DNA testing, courts apply a standard that considers how the vote of one juror might be swayed. *See, e.g.*, *Humphrey v. Morrow*, 717 S.E.2d 168, 173 (Ga. 2011) ("Under Georgia's death penalty laws, which provide for an automatic sentence less than death if the jury is unable to reach a unanimous sentencing verdict, a reasonable probability of a different outcome exists where 'there is a reasonable probability that at least one juror would have struck a different balance.'") (quoting *Wiggins*, 539 U.S. at 537. But that is *not* how Georgia courts analyze the issue in case involving death-sentenced individuals.

was no reasonable probability of a lesser sentence because the jury would not have "assumed that [Mr. Esposito] was only present" for the crimes and did not participate. R.6-1:22. The same assumption would logically apply to Ms. Woodward under the State's theory, yet she was given a lesser sentence. By the same token, if evidence established that Mr. Esposito had the level of culpability the State wrongly attributed to Ms. Woodward, then, under the materiality standard of cases like *Strickland*, it should have been inescapable that the DNA testing he sought was reasonably likely to support a lesser sentence.

**b.** Decisions of other Georgia courts, along with the Georgia Supreme Court's endorsement of the trial court's decision in Mr. Esposito's case, show how Georgia's reasonable-probability standard makes DNA testing illusory for individuals challenging their death sentences. In Mr. Esposito's case, despite reprimanding the trial court for legal error on a separate issue, the Georgia Supreme Court concluded there was "no apparent reversible error in the trial court's" reasonable-probability analysis. *Esposito,* 881 S.E.2d at 689. Other Georgia trial courts have applied the reasonable-probability standard in the same unduly circumscribed fashion to deny DNA testing sought to challenge a death sentence. In *Wilson*, a death-sentenced prisoner sought DNA evidence showing that his co-defendant, rather than he, stran-

50

gled the victim. *Wilson,* No. 39249B at 3-8 (May 30, 2019). In *Meders*, likewise, the court rejected the argument that finding other's suspects DNA on the murder weapon would support a mitigated sentence. *See Meders*, No. 8700763 at 7-8 & n.1. Similarly, in *Lance,* though not a relative culpability case, the court shrugged off the notion that the presence of someone else's DNA on "shell casings" and a "spent round" could implicate another person. *Lance*, No. 98-cr-0036 at 9 (Sept. 30, 2019).

**2.** Georgia's reasonable-probability standard, as construed by Georgia courts in death penalty cases, is also harsher than the standard approved in *Osborne* and by this Court in prior cases. To be sure, as recognized in *Cromartie*, there are "stacks of precedent accepting and applying 'reasonable probability' standards." 941 F.3d at 1257. Likewise, in *Osborne*, the Court observed that Alaska's requirement of "material" evidence resembles the federal DNA statute's "reasonable probability" standard, a statute which the Court held reflects the "common" approach. 557 U.S. at 63 (citing 18 U.S.C. § 3600(a)(8)).[11] Under the reasonable-probability standard reflected in the federal DNA statute discussed in *Osborne*, a standard routinely applied in cases involving ineffective representation and the state's suppression of exculpatory evidence, evidence that a co-defendant was the

---

[11]  *Osborne* was not a capital case and thus did not consider the application of materiality standards when new evidence is sought to mitigate a death sentence. Accordingly, *Osborne* is an especially inapt comparator here.

actual killer is sufficiently mitigating to warrant a new sentencing hearing. *See, e.g.*, *Brady v. State*, 174 A.2d 167, 171 (Md. Ct. App. 1961) (granting sentencing relief where prosecution failed to disclose co-defendant's confession to culpability), *aff'd*, 373 U.S. 83 (1963) (applying "reasonable probability" standard to assess prejudice from state's suppression of exculpatory evidence); *Duncan v. Ornoski*, 528 F.3d 1222, 1244 (9th Cir. 2008) (finding reasonable probability that petitioner would not have received death sentence had counsel investigated evidence "tend[ing] to establish that an accomplice" committed the murder); *Reams v. State*, 560 S.W.3d 441, 456 (Ark. 2018) (affirming grant of sentencing relief based on determination that evidence the co-defendant shot the victim "would have caused at least one reasonable juror to have doubt that the petitioner should be sentenced to death").

But as shown (*supra* at 48-52), Georgia's reasonable-probability standard, as construed by Georgia courts in cases involving death sentences, does not align with the "common" approach discussed in *Osborne*. 557 U.S. at 63. It applies a much more stringent standard. In other jurisdictions, where the relative culpability of two co-defendants (as it was portrayed by the State and understood by the jury) led one to receive a death sentence and the other life with the possibility of parole, evidence inverting that allocation of culpability would be reasonably likely to cause at least one

juror to vote for a sentence less than death. Georgia courts, applying a nigh-impossible-to-satisfy standard, hold otherwise.

**3.** The district court failed to seriously consider Mr. Esposito's arguments or accept the complaint's allegations, as Rule 12(b)(6) requires. It did not acknowledge how Georgia trial courts have applied the reasonable-probability standard. R.12:27-28. Even while concluding that Georgia's law is comparable to other legal regimes (*id.*), the court performed no analysis of how Georgia law, as authoritatively construed, compares to typical reasonable-probability provisions. Had it done so, as explained, it would have recognized that the DNA statute's reasonable-probability standard, as construed by Georgia courts in DNA cases involving death sentences, makes it impossible for capital offenders to obtain new DNA testing.

Indeed, the district court held that the Georgia trial court that considered Mr. Esposito's motion "did exactly what Plaintiff here claims it did not do" in deciding that there was no reasonable probability of a mitigated sentence. R.12:29. As discussed, that is incorrect. The court did not consider whether a single juror could reasonably be convinced that the death sentence was improper if Mr. Esposito produced DNA evidence establishing that he did *not* commit the physical beatings. And it inexplicably held that this evidence would not create a reasonable probability of a mitigated sen-

53

tence, even though the belief that Mr. Esposito committed the physical beating was unambiguously the State's basis for seeking the death penalty against him but *not* his co-defendant. In other circumstances, even under Georgia law, such circumstances would show that a death sentence is "disproportionate." *See, e.g.*, *Hall v. State,* 244 S.E.2d 833, 839 (1978) (striking down death sentence where "co-defendant triggerman received a life sentence")*, overruled on other grounds by Hamm v. State,* 756 S.E.2d 507 (Ga. 2014). But not under the DNA statute, as it has been construed by Georgia courts in cases seeking evidence to challenge death sentences.

Lastly, the district court noted that, in *Cromartie,* this Court rejected a challenge to Georgia's reasonable-probability standard because "the Supreme Court has already approved of this type of materiality standard in *Osborne*." R.12:30 (quoting 941 F.3d at 1257). In *Cromartie*, however, this Court did not consider any Georgia court decisions applying the reasonable-probability standard, instead assuming that Georgia's standard is comparable to Alaska's in *Osborne*, based on the notion that Georgia's standard is presumably consistent with the materiality requirements found in "stacks of precedent." 941 F.3d at 1257. That analysis in *Cromartie,* based on the limited facts and arguments presented in that record, does not control the outcome of this case. As explained above, Georgia courts apply a much more burdensome standard than what the *Osborne* court approved.

Indeed, Mr. Esposito's complaint names two Georgia cases—*Wilson and Lance*—neither of which were considered in *Cromartie.* R.1:31 ¶ 57 n.8. Those cases, and this one, establish an authoritative construction of Georgia law that was not before this Court previously. They show that the reasonable-probability standard, as construed by Georgia courts, is *not* comparable to the standard applied in other states.

## III. THE COMPLAINT PLAUSIBLY ALLEGES THAT THE DNA STATUTE VIOLATES THE EIGHTH AMENDMENT.

The complaint plausibly alleges that both challenged provisions of Georgia's DNA law violate the Eighth Amendment.

"Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force." *Roper v. Simmons*, 543 U.S. 551, 568 (2005). This principle is relevant, in particular, to ward against the prospect that an innocent or less culpable person will be arbitrarily and capriciously executed. *See, e.g.*, *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) ("The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case.") (quoting *Gardner v. Florida*, 430 U.S. 349, 363-364 (1977)).

This special concern embedded within the Eighth Amendment applies with significant force here. As explained, the purpose-of-delay provision, as

55

construed by Georgia courts, makes it virtually impossible for death-sentenced individuals to obtain new DNA evidence that could provide the factual predicate for a new trial or sentencing hearing. *See supra* at 20-26. Likewise, the reasonable-probability standard establishes an impossibly high bar for death-sentenced individuals to show the evidence they seek is material to their sentence. *See supra* at 48-52. Accordingly, there is an unacceptable risk that death-sentenced individual with meritorious claims for new DNA testing will be unable to obtain it, and thus unable to establish entitlement to a new proceeding. That is precisely the danger the Eighth Amendment wards against.

Nonetheless, the district court rejected Mr. Esposito's Eighth Amendment theory, reasoning it would constitutionalize a right to post-conviction DNA testing, contrary to the holding in *Alvarez*, 679 F.3d at 1265. R.12:23. It also cited several cases holding there is no freestanding Eighth Amendment right to DNA testing. R.12:23-24.

That analysis is mistaken. Unlike the plaintiff in *Alvarez* (a non-capital case), Mr. Esposito does not aim to "constitutionalize a right to access evidence for DNA testing." *Cf.* R.12:23. Rather he argues Georgia courts have construed the purpose-of-delay provision and reasonable-probability standard so restrictively, despite the state nominally making DNA testing available, that there is an intolerable risk that people will be arbitrarily and

56

capriciously executed because the State will deprive of them of their statutory right to obtain evidence establishing their innocence or mitigating their sentence. He does not assert a freestanding constitutional right to access DNA evidence but simply that, "[b]ecause of the uniqueness of the death penalty," the "procedures" under state law related to the imposition of that penalty—including those helping an individual escape it—must not be applied in a manner "creat[ing] a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion).

The Supreme Court has been clear that "[w]hen the choice is between life and death" a heightened "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty" is "unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett,* 438 U.S. at 605 (plurality opinion). Nonetheless, the district court found this principle inapplicable, insisting that the Eighth Amendment's scope is limited to the "decision to impose a capital sentence" and "what procedures are used to execute a prisoner"—and nothing in between. R.12:25.

That reasoning fails twice over. For starters, the State never argued for dismissal on this ground, so Mr. Esposito had no opportunity to oppose

it. This fundamental failure to provide Mr. Esposito notice and an opportunity to be heard on the basis of his claim's dismissal—a clear-cut due process violation—is sufficient reason to remand. *See, e.g.*, *Spaulding v. United States*, 710 F. App'x 430, 430 (11th Cir. 2018) ("'[A] court must accord the parties fair notice and an opportunity to present their positions' before disposing of a case on a ground not raised in their filings.") (quoting *Day v. McDonough*, 547 U.S. 198, 210 (2006)); *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1336 (11th Cir. 2011) (holding district court must give plaintiff an opportunity to respond before dismissing claim on grounds not raised by the defendant); *cf. Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015) ("elementary principles of procedural fairness" require allowing plaintiff to contest grounds for dismissal).

The district court was also wrong. It gave no reasoning for categorically excluding the Eighth Amendment from the wide gulf of matters between imposing a death sentence and the method of executing it. On the contrary, the Supreme Court has often applied the Eighth Amendment in contexts that fall between those points. In *Roper v. Simmons*, for instance, it held that the Eighth Amendment prohibits executing someone who committed the capital offense when they were under eighteen. 543 U.S. 551, 575 (2005). That holding has nothing to do with sentencing error or execution procedures. Likewise, in *Brumfield v. Cain*, the Court held that the Fifth

58

Circuit erred in precluding the petitioner from developing a claim of ineligibility for execution due to intellectual disability—a claim that did not exist at the time of trial. 576 U.S. 305, 324 (2015). And the Court has long "assumed" that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." *Herrera v. Collins*, 506 U.S. 390, 417 (1993); *see, e.g.*, *In re Davis*, 557 U.S. 952, 952 (2009) (directing district court to conduct hearing regarding "whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence").

Finally, the district court found it "impossible to conceive how the materiality provision of the statute and its application by the state court violate the Eighth Amendment," based on its view that the statute's reasonable-probability requirement resembles the materiality standard approved in *Osborne*. R.12:31-32. But, as shown (*supra* at 48-52), this provision, as authoritatively construed by Georgia courts, is *not* like the standard approved in *Osborne*, nor other lines of cases, like from *Strickland* and *Brady*, that employ a "reasonable probability" test.[12] Rather, Georgia's standard notably diverges from mainstream materiality jurisprudence, making it intolerably

---

[12]  Additionally, *Osborne* was not an Eighth Amendment case. The Supreme Court's approval of a materiality standard in *Osborne* under a separate constitutional provision does not show that *Georgia's* reasonable-probability standard passes muster under the Eighth Amendment.

59

likely that a death-sentenced person substantively entitled to testing under the Georgia law will be unable to establish their entitlement, and will therefore be wrongfully executed.

## CONCLUSION

The Court should reverse the decision below.

Dated: Nov. 7, 2025

Respectfully submitted,

ANNA ARCENEAUX
  *Georgia Resource Center*
  *104 Marietta Street NW*
  *Suite 260*
  *Atlanta, GA 30303*
  *(404) 222-9202*

MARCIA A. WIDDER
  *312 St. Paul Ave. SE*
  *Atlanta, GA 30312*
  *(504) 231-5651*

/s/ *Paul W. Hughes*
PAUL W. HUGHES
CAITLIN SHEARD
EMMETT WITKOVSKY-ELDRED
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

MARK PEARLSTEIN
  *McDermott Will & Schulte LLP*
  *200 Clarendon Street, Floor 58*
  *Boston, MA 02116*
  *(617) 535-4000*

*Counsel for Plaintiff-Appellant John Esposito*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7) because it contains 12,967 words, excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: November 7, 2025                    /s/ *Paul W. Hughes*


**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: November 7, 2025                    /s/ *Paul W. Hughes*